**UNITED STATES of America,
Appellee,**

v.

**Ralph CUOMO and John Rizzo, Jr.,
Appellants.**

**Nos. 810, 811, Dockets 73-1063, 73-1072.**

United States Court of Appeals,
Second Circuit.

Argued April 19, 1973.

Decided May 31, 1973.

---

Albert J. Krieger, Ivan S. Fisher, Alan Scribner, New York City, for appellant Cuomo.

Maurice Edelbaum, Henry J. Boitel, New York City, for appellant Rizzo.

Before CLARK, Associate Justice,[*] and WATERMAN and FEINBERG, Circuit Judges.

WATERMAN, Circuit Judge:

The defendants, Ralph Cuomo and John Rizzo, Jr., were convicted, following a three week jury trial in the United States District Court for the Southern District of New York, of receiving, concealing, selling and facilitating the transportation and sale of heroin in violation of Sections 173 and 174 of Title 21, United States Code [1] and were sentenced to ten years imprisonment and eight years imprisonment respectively. In view of the nature of the claims made by the defendants on this appeal we deem it necessary to describe in some detail the underlying activities which led to the indictment against them. We note at the outset that from our review of the trial record we are amply convinced that the judgment below should be affirmed.

Viewing the evidence in the light most favorable to the Government, as we must after a conviction (see United States v. Smalls, 363 F.2d 417 (2 Cir. 1966), cert. denied, 385 U.S. 1027, 87 S.Ct. 755, 17 L.Ed.2d 675 (1967) the evidence adduced at the trial revealed the following facts. Leonard Vecchione, a Group Supervisor of the Bureau of Narcotics and Dangerous Drugs (BNDD) met with Senior Investigator Edward Kayner of the New York Police and Michael Feinberg, a paid registered informant employed as a special employee of the BNDD, at the Sakele Restaurant in lower Manhattan at approximately 1 P.M. on October 14, 1970. After visiting with each other for about twenty minutes, they left the restaurant together and when outside Vecchione and Kayner conducted a relative-

Franklin B. Velie, John W. Nields, Jr., Asst. U. S. Attys., Whitney North Seymour, Jr., U. S. Atty., for appellee.

[*] Retired Associate Justice of the United States Supreme Court, sitting by designation.

1. These sections were repealed Oct. 27, 1970 by Public Law 91–513, effective May 1, 1971.

ly thorough search of Feinberg's car. The agents satisfied themselves that the car was clean of narcotics, and then, after this search, Feinberg left the agents and drove alone to the area of Houston and Ridge Streets in lower Manhattan. He was followed and was watched by another government agent, Mahoney. In the meantime agents Kayner and Vecchione returned to the Sakele restaurant and, at approximately 1:30 P.M., they there met agent King of the BNDD who was carrying a brown paper bag containing $20,000 in cash. This money was to be delivered to Feinberg and was to be used by Feinberg to purchase heroin from a contact with whom Feinberg had previously arranged to make a buy. After receiving the money from King, agents Vecchione, Kayner, and a third undercover agent, Gross, left the Sakele and drove in a police undercover taxicab to the area of Houston and Ridge Streets where Feinberg was awaiting them. The agents pulled the undercover taxicab to the curb and Vecchione, carrying the brown paper bag, left the vehicle and approached Feinberg who was standing on the corner. When he reached the place where Feinberg was standing the two of them walked together a short distance down Ridge Street into a hallway at 167 Ridge Street, the building in which Feinberg resided. Agent Vecchione then searched Feinberg fairly closely, and, after finding that Feinberg was clean of narcotics, he handed to him the paper bag containing the money. Vecchione then returned to the police taxicab and from that spot he maintained a close and continual watch. In addition to this taxicab a number of other undercover vehicles were stationed in the vicinity and a number of undercover agents were stationed on the street to assist in the surveillance of Feinberg. From then on Feinberg was under continual watch by the agents.

At approximately 2 P.M. the defendant John Rizzo drove up to Ridge and Houston Streets in his Cadillac automobile and parked it on the north side of Houston Street facing west. He immediately left his car and walked across the street to the spot where Feinberg was standing holding the money. Rizzo met briefly with Feinberg and during the course of a short conversation Feinberg handed the brown paper bag to Rizzo. Rizzo opened the bag, reached inside, and handed $500 back to Feinberg.

Leaving his Cadillac, Rizzo then left the area in Feinberg's car and drove down Houston Street in the direction of Mott Street where he made a left turn. In the meantime Feinberg remained on the corner of Ridge and Houston Streets under the surveillance of several agents. Other agents followed Rizzo who, having turned left onto Mott Street, stopped the car almost immediately and engaged in a brief conversation with a third person who was identified at trial as "John Doe" and was there described as a man of about five feet eight inches in height, 180 pounds, black hair, wearing a blue suit and a blue shirt. Following their brief conversation John Doe left Rizzo and walked up Mott Street in the direction of Prince Street. At the same time Rizzo drove around the corner and parked Feinberg's car a short block away at the other end of Prince Street. Rizzo then left the car, walked into Prince Street empty handed, and emerged, minutes later, carrying a brown paper bag containing heroin. He then placed the bag in the trunk of Feinberg's car and walked off in the direction of Ridge and Houston Streets where Feinberg was awaiting his return. About ten or fifteen minutes later the defendant Cuomo was seen speaking with John Doe on Prince Street near the spot where Rizzo had obtained the bag containing the heroin.

When Rizzo reached Ridge and Houston Streets he met Feinberg and, taking Feinberg in Rizzo's Cadillac, the two men drove to Feinberg's car, the car which now contained the heroin. Rizzo dropped off Feinberg and drove away. Feinberg then, with agents following, drove to a parking lot beneath the East

River Drive at 23rd Street where he and his car were searched again. The brown paper bag and the $500 that Rizzo had returned to Feinberg were recovered by the agents. Inside the paper bag were three clear plastic bags, one inside the other. The innermost plastic bag contained 977.8 grams (approximately two pounds or one kilo) of 88.6% pure heroin. On the sealing flap of the innermost plastic bag was the left thumb print of the defendant Ralph Cuomo. The Government's fingerprint expert testified at the trial that this discovery showed that Cuomo had left the print either by applying pressure to the flap as he would in the process of closing the bag, or by holding the bag at a time when some considerable weight was inside it.

On this appeal both defendants argue that their convictions should be overturned because their rights were violated by the conduct of the Government in obtaining the inculpatory evidence and in prosecuting them, and by the manner in which the trial judge conducted the trial. In particular, the defendants claim that: (1) The conduct of the law enforcement authorities in employing a paid informer and in providing him funds so that he could set up a narcotics buy from the defendants was so outrageous that it reached the proportion of a constitutional violation; (2) The Government misled the trial judge by giving false reasons for its motion when it attempted to support a government motion for a 90 day continuance, and that as a result of this government "fraud" the defense was unconstitutionally hampered in preparing its defense and the Government violated this circuit's six month speedy trial rules; (3) The Government failed to establish either defendant's guilt beyond a reasonable doubt; and (4) The defendants were deprived of a fair trial by allegedly inflammatory remarks made during the course of the trial. We find that none of these contentions have any merit, and that the proceedings below, conducted under somewhat difficult circumstances,

because, only a few days before the start of the trial, Feinberg came forward with a story that he had really "framed" the defendants, were eminently fair.

## THE USE OF THE INFORMER

The defendants' first argument is that their constitutional rights to fair play have been violated through what they allege to be "reprehensible" conduct on the part of the prosecution in employing as the purchaser of the narcotics an actively participating stool pigeon who was a man with a serious criminal record and who received in return for his connivance a monetary reward and, as he was awaiting sentence after a state narcotics conviction, promises of federal assistance in obtaining for him a sentence less severe then likely. Alternatively, they suggest that this court should, in the exercise of its supervisory authority, hold that such an arrangement amounts to entrapment as a matter of law. These arguments raise an issue akin to the issue raised by the defense of entrapment, but it differs from the entrapment defense issue in that it focuses only upon the propriety of the Government's conduct and does not involve factual issues relating to the predisposition of the defendants to commit crime. See United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); United States v. Smalls, 363 F.2d 417, 420 (2 Cir. 1966), cert. denied, 385 U.S. 1027, 87 S.Ct. 755, 17 L.Ed.2d 675 (1967); Williamson v. United States, 311 F.2d 441 (5 Cir. 1962). The entrapment defense, because it rests on the factual questions of the Government's involvement in setting up the crime, and the defendants' predisposition to commit the crime without the Government's involvement, must be raised at the trial and submitted to the jury. See United States v. Bishop, 367 F.2d 806, 809–810 (2 Cir. 1966); United States v. Jacobs, 431 F.2d 754, 762 (2 Cir. 1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120 (1971). However, inasmuch as the constitutional argument raised in this case depends

solely on a question of law, that is, whether the prosecution's conduct is so "shocking" as to constitute a violation of the defendants' right to due process, we discuss it even though the issue was not raised in the first instance in the court below. Having said this, we conclude that here, in this case, the prosecutor's conduct in employing an informant and in using him to set up the narcotics buy, is within the permissible limits to which the Government may go. The defendants do not dispute that artifice and stratagem, including the use of paid informants whose employment is made necessary by the clandestine nature of the criminal activities under investigation, may be constitutionally resorted to to uncover and identify those engaged in criminal enterprises. Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L. Ed. 413 (1932); Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L. Ed.2d 848 (1958). This case in this area of law enforcement is perhaps typical of the kind of case in which a paid informant may be used, and to declare that the Government exceeded permissible limits here would be tantamount to a declaration that paid informants may no longer be used in the enforcement of the laws designed to prevent the clandestine sale of "hard narcotics." Defendants' reliance on the Fifth Circuit decision of Williamson v. United States, *supra,* in which a conviction was set aside because an unconscionable relationship existed between the Government and its informant, is clearly misplaced. As noted by our court in United States v. Smalls, *supra,* in *Williamson* there was a unique

situation in which the evidence was clear that the Government agents offered a "specific sum of money to convict a specified suspect." United States v. Smalls, 363 F.2d at 420, quoting Williamson v. United States, 311 F.2d at 445. In this case Feinberg was employed by the BNDD to engage in narcotics transactions generally and not to deal with Cuomo and Rizzo, these defendants, specifically.[2] Also, although the payment arrangement between the Government and Feinberg was not clearly established at the trial, the evidence in the record indicated that it could not be characterized as a contingent fee arrangement in the sense that Feinberg would be given a special sum for bringing about a prosecution and for obtaining convictions of Cuomo and Rizzo. Here the Government provided the funds from which the buy was made; but the Supreme Court, in its most recent pronouncement on the general issue of entrapment, approved a situation in which the government agents provided an element much more essential to the commission of the crime than funds with which to make the purchase of heroin. See United States v. Russell, *supra.* Although in that case the Court conceded that "some day" it might "be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," we hold, as the Supreme Court held in Russell, 411 U.S. at 432, 93 S.Ct. at 1643 that our case "is distinctly not of that breed."

2. In its endeavors to prevent clandestine dealings in contraband hard narcotics the Government has resorted for many years in the New York City area to the sordid business of using "special employees," who, for pay, cooperate with enforcement officers to the extent of purchasing such narcotics from willing sellers with money furnished by the Government. Feinberg was such a "cooperating individual." As a "special employee" of the BNDD he was paid for whatever general information he might provide relative to dealers in hard narcotics and also for the help he might provide in preparing or attempting to prepare such cases for prosecution. There is no indication whatever in the record that the BNDD employed Feinberg with the intention that Feinberg should set up a narcotics transaction specifically with Cuomo and Rizzo. The use of this paid special employee does not, of itself, constitute entrapment, nor does it, in this case, "shock the conscience of the court." See United States v. Smalls, 363 F.2d 417 at 419–420 (2 Cir. 1966), cert. denied, 385 U.S. 1027, 87 S.Ct. 755, 17 L.Ed.2d 675 (1967).

## VIOLATION OF THE SIX MONTH RULE

The next ground raised by the defendants in seeking a reversal of their convictions is that the prosecution misled the court and the defense when it stated in open court that it desired a 90 day continuance before commencing trial and the reason it was requesting a 90 day continuance of the trial was that a material witness was "unavailable." The defense claims that as a result of not being informed of the real reason the Government was asking for the continuance it was deprived of valuable information that it would have used in preparing the defense. The defense also claims that because the Government made this misrepresentation to the court these 90 days should be charged against the Government in computing the time it took the prosecution to prepare for trial, and that when the 90 days are added to other time taken by the Government in preparing for trial the Government violated the Second Circuit's so-called Six Months' Speedy Trial Rule then in effect.[3]

In order to resolve these contentions we must examine the procedural history of this case. The two defendants were arrested on February 24, 1971 and were immediately released on bail. The indictments were filed by the Government on April 28, 1971. On June 24, 1971, only four months after the arrest, the Government filed a formal notice of readiness. On May 17, 1971 and on July 8, 1971 pretrial motions relating to discovery and other issues were filed by the defendants. These motions were not decided by the court until November 5, 1971. In October, 1971, and again in February, 1972, counsel for defendant Rizzo moved for a postponement of the trial on the ground that he had prior commitments; the court, with the consent of counsel for the defendant, Cuomo, granted both of the motions. A trial date was finally set for May 1, 1972.

On April 28, 1972 the Government requested a ninety day adjournment. The district judge was apprised in a sealed affidavit filed on April 24, 1972 that the Government was requesting the adjourn-

---

3. In the exercise of its supervisory power over the administration of justice in the federal courts of the circuit, the Circuit Council of the Second Circuit promulgated rules for observance in the district courts of the circuit with reference to the prompt disposition of criminal cases. These rules were first promulgated on January 5, 1971 and on May 4, 1971, and were in effect at the times pertinent to this case. They may be found in Title 28, U.S.C.A., Court of Appeals Rules, Cumulative Pocket Part 1972. Rule 4 provided:

In all [criminal] cases the government must be ready for trial within six months from the date of the arrest, service of summons, detention, or the filing of a complaint or of a formal charge upon which the defendant is to be tried (other than a sealed indictment), whichever is earliest. If the government is not ready for trial within such time, or within the periods as extended by the district court for good cause under rule 5, and if the defendant is charged only with non-capital offenses, then, upon application of the defendant or upon motion of the dis-

trict court, after opportunity for argument, the charge shall be dismissed.

Rule 5 provides that in computing the time within which the Government should be ready for trial, many periods of reasonable delay are excluded from computation. The dispute here relates to whether the periods of delay set forth in the text were reasonable and came within the exclusions permissible under Rule 5. As pointed out in the text we find no violation of Rule 4.

The Government further claims that even if the 90 days is included in the time computation chargeable to the Government the six month rule was not violated. However, in view of our finding that the 90 days should not be included, we do not reach this issue.

We note in passing that the Circuit's rules have since been superseded by the promulgation of district court rules for prompt disposition of criminal cases. These rules, which became effective October 1, 1972, were mandated by Fed. R.Crim.P. 50(b). See Hilbert v. Dooling, 476 F.2d 355 at 355, 356 (2 Cir., 1973) (in banc).

ment because Feinberg was then engaged in important investigations the success of which depended on his name remaining secret. At the hearing on the motion in open court on April 28, the prosecutor stated publicly that the Government wished to have the continuance because "a material witness in these cases is unavailable at the present time." The continuance was granted, and the trial finally commenced on October 3, 1972.

■ Limiting their presentation to the prosecutor's assertion in open court on April 28, 1972 that a material witness was "unavailable," the defendants maintain that the indictment should be dismissed. They argue that the Government committed a fraud on the court and a fraud on the defense which prejudiced the defense, and that, because of these misrepresentations, the Government violated the six month rule. There is a short answer to this argument. The contention is patently frivolous. The prosecution did not misrepresent to the court the real reason it wanted the continuance. The prosecution was completely justified in requesting the continuance so that Feinberg could retain his secret status as an undercover agent until other pending investigations in which he was involved were completed. Therefore the ninety days should be excluded from the computation of the pretrial time chargeable to the prosecution. See Rule 5(c)(ii), Second Circuit Rules Regarding Prompt Disposition of Criminal Cases.[4] Also, there is no merit to defendants' argument that they were prejudiced by the prosecutor's failure to reveal that the "material witness" was Feinberg. Although Feinberg later came forward with a story that he had framed the defendants, he was working for the prosecution on April 28. Therefore the fact that Feinberg's name was not revealed to the defense did not affect its efforts in any way. In short, we find that the defendants' arguments in this area of the appeal are utterly without merit.

## SUFFICIENCY OF THE PROOF

■ The defendants claim that their convictions should be reversed because as a matter of law the prosecution failed to prove guilt beyond a reasonable doubt. These contentions are shortly disposed of. Defendant Rizzo was observed by numerous surveillance agents receiving the purchase money from Feinberg at their meeting on October 14. He was observed carrying the bag of heroin along Mott Street after he obtained it from a Prince Street location, observed placing the bag in the trunk of Feinberg's car, and observed driving Feinberg to that car in order for Feinberg to recover the heroin which Rizzo had placed in that car's trunk.

As to the defendant Cuomo the question is somewhat closer, but still, on the basis of two significant items of evidence presented to the jury, the evidence was sufficient. Of first importance was the fact that Cuomo's fingerprint appeared on the sealing flap of the innermost transparent plastic bag containing the heroin. The Government's expert witness testified that Cuomo had handled the bag either at a time when the bag was full of a weighty substance—presumably heroin—or in such a manner as to close the bag. Inasmuch as the bag was transparent Cuomo would have known of the nature of the substance in the bag when he handled it or closed the

---

4. Rule 5(c)(ii) reads as follows:

    5. In computing the time within which the government should be ready for trial under rules 3 and 4, the following periods should be excluded:

       \*      \*      \*      \*      \*

    (c) The period of delay resulting from a continuance granted at the request of a prosecuting attorney if:

       \*      \*      \*      \*      \*

    (ii) the continuance is granted to allow the prosecuting attorney additional time to prepare the government's case and additional time is justified by the exceptional circumstances of the case.

flap. Cuomo's main argument is that the presence of his fingerprint on the flap does not tend to prove that he ever handled the bag when it contained heroin or, assuming he did touch the bag while it contained heroin, that he ever exercised the degree of control over the drug necessary to meet the statutory requisite of possession. Cuomo cites two cases from this circuit as authority for the proposition he advances. In United States v. Lefkowitz, 284 F.2d 310 (2 Cir. 1960) the court held that evidence that a person's fingerprint appeared on a large container of contraband was not, by itself, sufficient evidence on which to base a finding that the person whose fingerprint was so found possessed the contraband inside the cartons. In United States v. Minieri, 303 F.2d 550 (2 Cir. 1962) the same conclusion was reached where the defendant's fingerprint appeared on invoices which had been inside large boxes of contraband. However, the underlying rationale of each of these cases was that, inasmuch as large containers of ordinary merchandise may be touched by many hands in the ordinary course of loading and unloading the containers, it would be an unwarranted inference to infer, from the mere presence of a man's fingerprint on such a box or on invoices of large shipments, that the man knew that the contents of the box were contraband or that he possessed the contraband. In *Lefkowitz* the court specifically excepted from the rule it established in that case the situation in which fingerprints are found on "glassine envelopes or small packages" of narcotics. United States v. Lefkowitz, 284 F.2d at 310. As the case now before us clearly falls within this exception the holding in *Lefkowitz* would not be dispositive here even if Cuomo's fingerprint were the only incriminating evidence against him. However, it was not the only evidence. Cuomo was with *John Doe* in the vicinity of Prince Street only a few minutes after Rizzo had spoken with Doe and had obtained the heroin on Prince Street. Although perhaps neither of these facts, standing

alone, would support a finding of Cuomo's guilt, their collective weight is clearly sufficient to sustain Cuomo's conviction. See United States v. Perillo, 164 F.2d 645, 646 (2 Cir. 1947); Stoppelli v. United States, 183 F.2d 391 (9 Cir. 1950), cert. denied, 340 U.S. 864, 71 S. Ct. 88, 95 L.Ed. 631 (1950); United States v. Pisano, 193 F.2d 361, 365 (7 Cir. 1951).

## MISCELLANEOUS ISSUES

■ Additionally, the defendants argue that the jury that convicted them was exposed to prejudicial information about the defendants and that the exposure of this information prevented them from having a fair trial. They state that at one point during the trial the jury saw a fingerprint card which was held by the prosecutor and that an imprint of Cuomo's fingerprint was on the card. This, they say, prejudiced Cuomo for it indicated to the jury that he had had prior dealings with the BNDD. The defendants also claim to have been prejudiced by a statement made by Investigator Gross that he had seen a picture of the defendants, by a statement made by Feinberg that the different defendants in an entirely different trial arising out of unrelated events had been there found guilty, and by a statement made by the prosecutor during his questioning of Feinberg that Feinberg had said during a meeting with agents that he (Feinberg) feared Rizzo's father and would not testify against Rizzo for that reason. The defendants claim that Gross's statement indicated that the defendants had criminal records, Feinberg's statement indicated that they were guilty of wrongdoing like the defendants in the unrelated case, and the prosecutor's statement indicated that the defendants were members of an organized crime family. We think it is pure speculation to say, as the defense does, that the jury would have drawn the prejudicial inferences from the statements described or from its exposure to the fingerprint card (there is some dispute as to whether this card was actual-

ly seen by the jury). Moreover, on all occasions when possible adverse inferences could have been drawn, the trial judge took careful and effective corrective actions. The defendants were not deprived of their right to a fair trial.

The convictions are affirmed.