**UNITED STATES of America**

v.

**Charles F. BROWN, Defendant.**

**No. 78 Cr. 497.**

United States District Court, S. D. New York.

Nov. 29, 1978.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City by John F. Kaley, Asst. U. S. Atty., New York City, of counsel, for plaintiff.

Leon B. Polsky, Federal Defender Services Unit, Legal Aid Society, New York City by John P. Curley, New York City, of counsel, for defendant.

## MEMORANDUM AND ORDER

KNAPP, District Judge.

Defendant Charles Brown, a plumber by trade, is charged in this single-count indictment with possession of unregistered explosive devices or "pipe bombs." After a trial, which ended with the jury deadlocked seven to five for acquittal, Brown moved for a judgment of acquittal pursuant to Rule 29(c), Fed.R.Cr.P. Upon oral argument on that motion, we asked counsel to submit briefs on the issues of whether, assuming denial of the motion to acquit, we could or should dismiss the indictment under our supervisory power over the administration of criminal justice. We now deny the Rule 29 motion for acquittal, but dismiss the indictment under our supervisory power.

### Facts

There is agreement on most of the facts in this case. The government presented four witnesses, three of whom were agents for the Bureau of Alcohol, Tobacco, and Firearms ("BATF").[1] Their testimony established that at about 1:00 P. M. on June 19, 1978, in response to a telephone call from an informer, several BATF agents, including an undercover agent named Raul Rodriguez, drove to the vicinity of 80th Street and Riverside Drive in Manhattan. When they arrived there, Rodriguez met with the informer, who introduced him to defendant Brown. After a brief conversation, which was recorded on a hidden tape recorder, Brown sold Rodriguez five devices in a brown paper bag for $650. Brown was then arrested by other BATF agents who had arrived on the scene at about the same time as Rodriguez and had observed the transaction.

All of the five devices were made of metal tubing and had fuses. One device was dismantled and found to contain an explosive powder, which was also present on one of the fuses. No analysis was made of the other devices.

Brown took the stand and admitted the essential facts related by the agents. He denied, however, that he had known or believed that the devices he had sold were in fact real explosives. Brown testified that about 11:30 A. M. on June 19th, the informer, whom he knew from the neighborhood as "Mousie," approached him with a scheme in which he wanted Brown to participate. During a fifteen minute discussion in Brown's apartment, Mousie showed him five fake pipe bombs which he had brought to the apartment in a paper bag, and told him he had a potential customer who—mistakenly believing that the bombs were real—was willing to pay $650 for them. If Brown should help Mousie sell the fake bombs, Mousie would pay him $50. Brown, who was unemployed at the time, agreed. Mousie then left Brown's apartment, taking the bag with him, to call the prospective buyer. When he returned he told Brown that the buyer would meet them on 80th Street and Riverside Drive at 1:00 o'clock. Brown and Mousie then proceeded to that area. Brown's testimony concerning the events that followed differs in no substantial respect from that of the agents who testified for the government.[2]

---

1. The final government witness worked in the crime lab of the New York City police department.

2. There are minor discrepancies between Brown's and Rodriguez' recollections of their conversation immediately preceding the sale. Thus Rodriguez remembered Brown as having said that he obtained bombs from his "brother" while Brown denied this. The very indistinct tape recording does not—in our view at least—resolve the conflict. However either Brown's

Immediately after his arrest, Brown made a statement to the agents that was substantially identical to his testimony at trial. Although that statement was not admitted into evidence, we indicated in a bench colloquy that in the event the government challenged Brown's veracity on cross-examination the statement would be admissible on re-direct examination to demonstrate that his version of events was not a recent fabrication. Although the statement was not offered on re-direct, it would be admissible for these purposes in any future trial.[3]

The only testimony contradicting Brown's version of the events preceding the sale was that of the informer, Mousie,[4] who was called as a court witness at defense counsel's request. Mousie testified that at the time of Brown's arrest he was working for BATF as a paid informer and that he received $500 for his role in the events of June 19. This was not his first venture into this line of work. On prior occasions BATF agents had paid him $250 and $350 as an informer. The pay he received for any work depended on BATF's estimate of its importance. In addition, he testified that he was under indictment in a New Jersey state court on charges of breaking and entering, larceny, and conspiracy, and that he planned to testify for the state in that case in return for a promise of leniency. Mousie also testified that the agents with whom he was working in New York had interceded on his behalf in the New Jersey case and that he hoped that his work for them would be favorably considered when sentence was imposed. Finally, Mousie admitted that he had been previously convicted on charges of arson, larceny, breaking and entering, possession of a stolen car, and possession of a controlled substance and had served approximately seven years in prison on these charges. Mousie's total testimony, together with his demeanor on the witness stand, convinced us that he is an absolutely amoral individual without scruples of any kind.

Mousie's version of the events preceding the sale differs substantially from Brown's. According to Mousie, sometime in early June of 1978 he overheard Brown and three other persons negotiating what sounded like a sale of pipe bombs. Mousie thereupon telephoned Agent O'Leary of BATF, told him of this activity, informed him of Brown's identity, and asked if BATF wished him to pursue this lead. As O'Leary instructed him to do, Mousie told Brown that he had a friend interested in buying any bombs he could supply. Although Brown was agreeable, the next contact between the two did not come until about two weeks later on June 16th, when, again according to Mousie, Brown told him that he had one bomb to sell and wished to arrange a deal for the following Monday, June 19th. Mousie visited O'Leary at BATF's office to relay this information, and was told to go ahead with the deal. When Mousie arrived at Brown's apartment on June 19th, he found five pipe bombs—not one—on the kitchen table in a brown paper bag. Brown told him that all five bombs were for sale. Mousie again called O'Leary before he left with Brown for the 80th Street-Riverside Drive area. Mousie's version of the events that followed was, like Brown's, consistent with that of the agents.

No evidence corroborates Mousie's version of the pre-sale events. If, as Mousie

---

or Rodriguez' version would be equally consistent with Brown's testimony that he was puffing his own expertise in order to hoodwink Mousie's supposedly gullible client.

**3.** Presumably defendant's counsel refrained from offering the statement for fear that the court might then allow the government to prove defendant's extensive criminal (misdemeanor) record on the theory that a person with such a record would be more likely to come up with a detailed explanation than a first offender. The importance of this consideration would be lessened by the government's subsequent discovery that one of defendant's convictions had been for a felony. Moreover, defendant's counsel might well find it useful to argue that the very existence of his client's criminal record was precisely the consideration that lead Mousie to select him as victim for a frame-up.

**4.** Mousie's real name is Richard Delli Santi.

testified, BATF agents were apprised of the sale three days in advance, they could easily have kept Mousie and/or Brown under surveillance on the day of the sale. Had they done so, the agents and the jury would have known whether Mousie brought the devices to Brown's apartment, as Brown testified, or whether they had been there previously, as Mousie claimed. The agents, however, failed to take this simple precaution. Other than their observation of the transaction itself, they conducted no surveillance at all. The fruit of this failure is a complete lack of corroboration on the crucial issue in this case.

The trial was a brief one. The jury deliberated for two and one-half days—longer than it had taken to present the evidence—before announcing that it was hopelessly deadlocked seven to five for acquittal.

### Discussion

#### I. *Rule 29 Acquittal.*

In evaluating Brown's motion for an acquittal under Rule 29, Fed.R.Cr.P., we must determine whether the evidence before the jury was substantial enough for reasonable jurors to find guilt beyond a reasonable doubt. *United States v. Taylor* (2d Cir. 1972) 464 F.2d 240.

We did not find the government's case to be a strong one. On the essential issue—whether Brown knew the devices to be pipe bombs—we have only the paid informer's word against Brown's. The informer's hope for leniency in New Jersey, his laundry list of prior convictions, his generally unsavory character and, most importantly, his economic motive for producing arrests lead us to view him as a witness in whom we would place little confidence. Nor did Brown's version of events, as it emerged from his testimony, strike us as less plausible than Mousie's. Had we been the trier of fact, we would have found that the conflict between Brown's testimony and Mousie's—in the absence of any corroborating evidence—raised a reasonable doubt requiring an acquittal.

This view of the evidence does not, however, control the outcome here. In considering this motion, our task is only to determine whether there are facts in evidence which if unanswered would justify reasonable jurors in returning a guilty verdict. *Taylor, supra,* 464 F.2d at 242. Despite our skeptical view of Mousie's testimony, we cannot say that the jury was not entitled to believe him—and reject defendant's contrary testimony—if it chose to do so. It is for the jury, not the court, to decide what testimony should be believed. *Taylor, supra,* 464 F.2d at 245. Although we would have acquitted Brown had we been the trier of fact, his Rule 29 motion for acquittal must be denied.

#### II. *Supervisory Power Over the Administration of Justice.*

The question of whether we should dismiss the indictment under our supervisory power is more troubling. The argument for dismissal takes as its starting point the dangers inherent in the use of paid informers. Defendant argues that because of such dangers, the government should be obliged, where feasible, to make at least some minimal effort to check the accuracy of a paid informer's story. The government's failure to have made any such effort despite opportunities for it to have done so creates, according to defendant, unacceptable risks of a miscarriage of justice. Although this argument raises difficult questions of policy, we are inclined to agree.

The seminal case on the role of the judiciary in supervising the administration of criminal justice in federal courts is *McNabb v. United States* (1943) 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. In that case, Mr. Justice Frankfurter wrote for a seven to one majority that "[j]udicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence. Such standards are not satisfied merely by observance of those minimal historic safeguards for securing trial by reason which are summarized as 'due process of law' . . ." (at 340, 63 S.Ct. at 613). We read *McNabb* as recognizing an inherent authority in federal courts to insure that federal criminal inves-

tigations and trials are conducted with appropriate safeguards against unacceptable risks of the miscarriage of justice. See *Williamson v. United States* (5th Cir. 1962) 311 F.2d 441, 444. In *Williamson* the court relied upon *McNabb* in reversing a conviction because the court found, among other things, that the use of an informer hired on a contingency basis to obtain information concerning specified individuals created an unacceptable risk of a "frame-up" (311 F.2d at 444). "The opportunities for abuse" in such an arrangement, declared the court, "are too obvious to require . . . elaboration." (id.).

The applicability of *Williamson* in this Circuit remains an open question. Our Court of Appeals has on several occasions declined to extend *Williamson* beyond its peculiar facts or to articulate a broad rule denying the government the right to rely on paid informers. *United States v. Neal* (2d Cir. 1976) 536 F.2d 533, 534 *cert. denied* 429 U.S. 857, 97 S.Ct. 155, 50 L.Ed.2d 134; *United States v. Cuomo* (2d Cir. 1973) 479 F.2d 688, 692 *cert. denied* 414 U.S. 1002, 94 S.Ct. 357, 38 L.Ed.2d 238; *United States v. Smalls* (2d Cir. 1966) 363 F.2d 417, 420 *cert. denied* (1967) 385 U.S. 1027, 87 S.Ct. 755, 17 L.Ed.2d 675. The facts of *Cuomo* and *Smalls* merit detailed discussion.

*Cuomo* presents an elaborate picture of government surveillance of a paid informer. In that case, the agents carefully searched both the informer and his automobile, satisfying themselves that both were clean of contraband, before the informer left to rendezvous with one of the defendants. From the conclusion of such searches until that defendant's arrest, several agents kept the informer under "a close and continual watch" while several other agents observed the defendant's movements. The agents eventually observed the informer give the defendant money they had supplied to him, and watched the defendant place in the trunk of the informer's automobile a bag later found to contain heroin. The Court of Appeals rejected defendants' claim of impropriety in such use of an informer. Speaking through Judge Waterman, the Court declared (479 F.2d at 692):

"This case . . . is perhaps typical of the kind of case in which a paid informant may be used, and to declare that the Government exceeded permissible limits here would be tantamount to a declaration that paid informants may no longer be used in the enforcement of the laws designed to prevent the clandestine sale of 'hard narcotics.' "

In *Smalls,* agents' detailed observations similarly confirmed an informer's testimony. The evidence established that the defendant had been introduced to an undercover agent by a paid informer. During an automobile ride with the informer present, the defendant negotiated to sell heroin to the agent. With another agent observing, he then left the car, entered a building, and emerged a short time after carrying a package of heroin. He delivered that package to the agent, who had remained with the informer in the automobile. The defendant took the stand and claimed—in contrast to the testimony both of the agents and of the informer—that the informer had accompanied him when he left the automobile and entered the building. The Court of Appeals rejected the defendant's claim that the use of the informer required dismissal, but reserved "for another day the knotty problems posed by an attempt to put limits on the use of an informer." *Smalls, supra,* 363 F.2d at 420. This case forces upon us those "knotty problems" the *Smalls* court did not have to face.

█ We are here confronted with a situation which is the exact antithesis of the ones before the Court in *Cuomo* and *Smalls.* In each of those cases the Court, in affirming convictions, noted that the government agents had gone to great lengths—by surveillance both of the informer and the defendant—to neutralize the risk inherent in the use of paid informers. Here, on the other hand, the agents took no precautionary measures whatever. On the contrary, they let their informer prowl around the city and simply showed up in order to spring the trap when the informer told them it had been duly baited. In conse-

quence we are left with absolutely no means of checking the reliability of the paid informer's testimony on the crucial issue of the case. As a court of first impression, it is not our role to devise general rules for the guidance of other courts. We do, however, believe that the integrity of a criminal trial is unacceptably compromised when the government (1) uses as an informer a wholly amoral individual, (2) provides him with an economic motive for producing arrests by rewarding him on a contingency basis and (3) fails to take any steps whatsoever to insure the reliability of his version of events, despite (4) ample opportunity for it to do so. Where, as here, all four of these elements are present, we believe that a criminal defendant is needlessly exposed to unacceptable risk of a serious miscarriage of justice and that his trial should not be allowed to continue.

██ Although the Court in *Smalls* did not mention dismissal of an indictment as an appropriate means of putting "limits on the use of an informer", its subsequent decisions in *United States v. Jacobs* (2d Cir. 1976) 547 F.2d 772 and *United States v. Fields* (2d Cir. 1978) 592 F.2d 638, establish that the dismissal of an indictment —or a count thereof—is a sanction within the court's supervisory power. In *Jacobs* the Court actually dismissed a count of the indictment,[5] and in *Fields* it went to great lengths to demonstrate why discretion to dismiss had been abused in the particular case before it.[6] We therefore need not analyze the government's argument that the earlier case of *United States v. Weinstein* (2d Cir. 1971) 452 F.2d 704, *cert. denied* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 should be read as wholly denying the very existence of such power.

Nor does the very recent decision of the Court of Appeals in *United States v. Tanu* (2d Cir. 1978) 589 F.2d 82, expand the *Weinstein* holding. The Court was not there dealing with the "knotty problem" reserved in *Smalls* or indeed with any attempt by a court to protect the integrity of its own fact-finding processes. Significantly none of the authorities collected in footnotes 5 and 6 of the Court's opinion deal with any such problem. Indeed in *Ex Parte United States* (1916) 242 U.S. 27, 39, 37 S.Ct. 72, 73, 61 L.Ed. 129 the Supreme Court specifically directed attention to the district court's finding that "nothing exists in this case which moved the court to suspend the execution of sentence to prevent 'an abuse of the court's process, or to prevent an injustice being done to the defendant' . . ." While it is of course possible that the Court of Appeals might apply to such a situation the broad language of *Weinstein* and *Tanu*, it has not yet done so.

Recognizing some basis for our concern, the government nonetheless urges us not to exercise our supervisory power, but to rely on it to take administrative action to prevent repetition of the sloppy procedures disclosed by this record. Thus in a letter dated October 20, 1978, the government writes:

"We, of course, must agree that the better practice would have been for the agents involved in the investigation to give more attention to the proper supervision of the informant. In this regard, we share Your Honor's concerns. To insure that appropriate supervision is provided in the future and to prevent a

---

5. Also see *Ballard v. United States* (1946) 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181.

6. We do not believe that the admonitions in the *Fields* opinion are here applicable. In that case there was no contention that the criticized governmental activities had resulted—or ever could result—in a miscarriage of justice. The Court was there concerned only with the circumstances—if any—in which a court would be justified in dismissing an indictment because it found abhorrent governmental practices

which had no tendency to compromise the integrity of the criminal fact-finding process. Here, on the other hand, we are concerned only with the integrity of that process. We are, of course, aware of our obligation to use our supervisory power sparingly and with circumspection. Cf. *United States v. Russell* (1973) 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366, *Hampton v. United States* (1976) 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113.

reoccurrence of the conduct which has troubled Your Honor in this case, we have scheduled a conference with Michael J. LaPerch, Jr., Special Agent-in-Charge of the New York office of the Bureau of Alcohol, Tobacco and Firearms, during which we intend to advise Mr. LaPerch of the Court's concern with respect to the manner in which the investigation of this case was conducted."

Two flaws in that proposal appear to us to be fatal. In the first place it obviously fails to deal with our very real fear that the criticized conduct might have resulted in an unjustified arrest in this very case. Secondly when considered for its effect on future conduct, the suggested "conference" would be effective only so long as the involved agents remember it. On the other hand a judicial declaration that such conduct will not be allowed to result in conviction might well—especially if affirmed on appeal[7]—result in permanent curtailment of such dangerous practices. Compare *United States v. Jacobs* (2d Cir. 1974) 547 F.2d 772, 778.[8]

Nor are there open to us any other effective sanctions. It would, for example, be meaningless to exclude the testimony of the informer. It was only by causing him to be called as a witness that defendant was able to demonstrate the dangers of his use. And there would be no sense in excluding the agents' testimony, thus depriving the court of the only reliable evidence.[9]

---

**7.** We note that if the Court of Appeals should—in this case or at some other time—lay down guidelines to protect against *unreliable* use of informers, such guidelines could never result in the exclusion of *reliable* evidence. By hypothesis, any time the government could satisfy the court that a particular informer's evidence had been obtained without unacceptable risk of frame-up, such evidence would be admitted. This is in sharp contrast with the oft-criticized Fourth Amendment exclusionary rule, which almost invariably keeps from the jury wholly reliable testimony. Nor is the Supreme Court decision declining to sanction the use of the entrapment defense as a device for judicial monitoring of governmental morality (*United States v. Russell,* supra), here applicable. We intervene here not because of any concern for official morality but only because we have found that the government's investigative procedures were so negligent—amounting to a reckless disregard for known dangers—as

In summary, we deny defendant's Rule 29(c) motion for acquittal, but in the exercise of our supervisory powers over the administration of criminal justice direct that the indictment be dismissed.

SO ORDERED.

---

to compromise the integrity of our fact-finding process to such an extent as to create an unacceptable risk of miscarriage of justice.

**8.** The *Jacobs* case is of course distinguishable because here—unlike the situation in *Jacobs* and in *Estepa* which it cites—our action will cause defendant to "go scott free". Cf. *United States v. Estepa* (2d Cir. 1972) 471 F.2d 1132, 1137. However, as already noted, there is also a distinction on the other side in that here—unlike either of those cases—there is real concern that substantive injustice might have been done to this particular defendant.

**9.** We could, of course, exclude the testimony of both the agents and the informer. Such action would be tantamount to a dismissal. See *Ramos Colon v. U. S. Atty. for D. Puerto Rico* (1st Cir. 1978) 576 F.2d 1, 4 n. 2.