**UNITED STATES of America, Appellant,**

v.

**Charles F. BROWN, Defendant-Appellee.**

**No. 816, Docket 79–1011.**

United States Court of Appeals, Second Circuit.

Argued March 29, 1979.

Decided July 13, 1979.

---

Steven Lloyd Barrett, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant-appellee.

John F. Kaley, Asst. U.S. Atty., S. D. N. Y., New York City (Robert B. Fiske, Jr., U.S. Atty., Robert J. Jossen, Asst. U.S. Atty., S. D. N. Y., New York City, of counsel), for appellant.

Before MOORE, FRIENDLY and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

The United States appeals from a judgment entered in the United States District Court for the Southern District of New York, Whitman Knapp, *Judge*, dismissing an indictment against Charles F. Brown, the dismissal being ordered "in the exercise of [the district court's] supervisory powers over the administration of criminal justice." 462 F.Supp. 184 (S.D.N.Y.1978). For the reasons that follow, we reverse the judgment of the district court and order the indictment reinstated.

The facts relevant to this appeal have been set out by the district judge and, for the most part, are not disputed. At a trial beginning September 11, 1978, the government called three agents from the Bureau of Alcohol, Tobacco and Firearms ("BATF"). They testified that on June 19, 1978, they received a telephone call from an informant named Richard Delli Santi, alias "Mousie." In response to this phone call, a number of BATF agents including an undercover agent named Raul Rodriguez drove to the vicinity of 80th Street and Riverside Drive in Manhattan. There Rodriguez met with Delli Santi, who in turn introduced Rodriguez to appellee Brown. After a brief conversation, which was surreptitiously recorded, Brown sold Rodriguez a brown paper bag containing five items for $650. At least one of these items was a device commonly referred to as a "pipe bomb" consisting of metal tubing, a fuse, and explosive powder. Brown was arrested by the BATF agents who had observed the entire transaction, and he was subsequently charged with one count of possessing an unregistered firearm in violation of 26 U.S.C. §§ 5841, 5845(a) and (f), 5861 and 5871.

Brown himself testified at the trial, and he admitted that the above-described event had taken place. But he denied that he knew or believed that the items in the brown paper bag, the items which he sold to Rodriguez, were in fact "real" pipe bombs. His story took the following course. On June 19th, Delli Santi suggested to Brown that the two of them participate in a scheme to "rip off" a customer that Delli Santi was prepared to set up. Delli Santi showed Brown five "fake" pipe bombs in a brown paper bag that he had brought with him to Brown's apartment. He also told Brown that he knew of a customer who, believing that the pipe bombs were real, would pay $650 for them. If Brown would help Delli Santi, so the story goes, Delli Santi would pay Brown $50. Brown, unemployed at the time, agreed. Delli Santi then called the prospective buyer, who turned out to be undercover agent Rodriguez, and the sale was made. Needless to say, Brown did not collect the $50 from Delli Santi.

Brown's version of the events preceding the sale to Rodriguez was contradicted only by Delli Santi, who was not called by the

government but was instead called by the court as a court witness at the request of Brown's attorney. Delli Santi testified that he worked as a paid informer for the BATF, and that he had received $500 for his role in the events leading up to Brown's arrest. His version of the story was as follows. In early June of 1978 Delli Santi overheard Brown and three others negotiating what sounded like the sale of pipe bombs. He advised the BATF of this, and asked whether the "lead" should be pursued. One of the BATF agents told him to follow up on the lead and he promptly told Brown that he might be able to come up with a buyer. Brown was agreeable, but nothing was to come of it until a few weeks later when Brown called Delli Santi to say that he was ready to make a sale. Delli Santi informed the BATF of this development, and he was told to proceed with the arrangements. Delli Santi went to Brown's apartment, where Brown showed him the pipe bombs he had prepared, and the sale took place.

After deliberating for nearly three days, the jury was hopelessly deadlocked, the vote being seven to five for acquittal. On consent, a mistrial was declared.

Brown moved for a judgment of acquittal under Fed.R.Crim.P. 29, but the district court denied the motion with the following explanation:

> In evaluating Brown's motion for an acquittal under Rule 29, Fed.R.Cr.P., we must determine whether the evidence before the jury was substantial enough for reasonable jurors to find guilt beyond a reasonable doubt. . . .
>
> We did not find the government's case to be a strong one. On the essential issue—whether Brown knew the devices

to be pipe bombs—we have only the paid informer's word against Brown's. The informer's hope for leniency in New Jersey, his laundry list of prior convictions, his generally unsavory character and, most importantly, his economic motive for producing arrests lead us to view him as a witness in whom we would place little confidence.[1] Nor did Brown's version of events, as it emerged from his testimony, strike us as less plausible than Mousie's. Had we been the trier of fact, we would have found that the conflict between Brown's testimony and Mousie's —in the absence of any corroborating evidence—raised a reasonable doubt requiring an acquittal.

> This view of the evidence does not, however, control the outcome here. In considering this motion, our task is only to determine whether there are facts in evidence which if unanswered would justify reasonable jurors in returning a guilty verdict. . . . Despite our skeptical view of Mousie's testimony, we cannot say that the jury was not entitled to believe him—and reject defendant's contrary testimony—if it chose to do so. It is for the jury, not the court, to decide what testimony should be believed. . . Although we would have acquitted Brown had we been the trier of fact, his Rule 29 motion for acquittal must be denied.

462 F.Supp. at 187 (citations omitted). At the same time, however, the court ordered that the indictment against Brown be dismissed, the dismissal being an exercise of the district court's "supervisory powers over the administration of criminal justice" and being based on the government's failure to supervise adequately its paid informant.

---

1. Earlier testimony by Delli Santi showed that he had worked as a paid informant before, and that the BATF had paid him between $250 and $350 on other occasions. The amount of money he received depended upon the BATF's estimation of the importance of the work. Delli Santi also testified that he was under indictment in New Jersey on state charges of breaking and entering, larceny, and conspiracy, and that he planned to testify for the state in that case in return for a promise of leniency. He

also testified that the New York BATF agents had interceded on his behalf in the New Jersey case and that he hoped his work for them would be favorably considered when the sentence was imposed. He also admitted that he had been convicted of arson, larceny, breaking and entering, possession of a stolen car, and possession of a controlled substance. He had served approximately seven years in prison on these charges. *See* 462 F.Supp. at 186.

The court explained its decision in the following terms:

> Here . . . the agents took no precautionary measures whatever. On the contrary, they let their informer prowl around the city and simply showed up in order to spring the trap when the informer told them it had been duly baited. In consequence we are left with absolutely no means of checking the reliability of the paid informer's testimony on the crucial issue of the case. As a court of first impression, it is not our role to devise general rules for the guidance of other courts. We do, however, believe that the integrity of a criminal trial is unacceptably compromised when the government (1) uses as an informer a wholly amoral individual, (2) provides him with an economic motive for producing arrests by rewarding him on a contingency basis and (3) fails to take any steps whatsoever to insure the reliability of his version of events, despite (4) ample opportunity for it to do so. Where, as here, all four of these elements are present, we believe that a criminal defendant is needlessly exposed to unacceptable risk of a serious miscarriage of justice and that his trial should not be allowed to continue.

462 F.Supp. at 188–89. The court also pointed to its "very real fear that the criticized conduct might have resulted in an unjustified arrest in this very case." 462 F.Supp. at 190. Accordingly, the court ordered the indictment dismissed.[2] The government has appealed.[3]

The sole question on this appeal is whether the district court should have exercised its "supervisory powers" in the manner that it did. In our judgment it should not have.

We have recently reaffirmed the principle that "while a district court may grant a new trial after conviction, pursuant to Fed. R.Crim.P. 33, 'in the interest of justice,' it does not have the power to *dismiss* an indictment that is legally sufficient under the test of Rule 29, simply because it deems the dismissal to be in the interests of justice." *United States v. Lai Ming Tanu*, 589 F.2d 82, 86 (2d Cir. 1978) (footnote omitted). *See generally United States v. Weinstein*, 452 F.2d 704 (2d Cir. 1971), *cert. denied*, 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972). Here, however, the district court did not so much find that the "interests of justice" required dismissal of the indictment as it found that the government's behavior in the case threatened to compromise the integrity of the criminal trial and the administration of justice. We have recently expressed our views on these concerns as well.

In *United States v. Fields*, 592 F.2d 638 (2d Cir. 1978), *cert. denied*, —— U.S. ——, 99 S.Ct. 2838, 61 L.Ed.2d 310 (1979), this Court, describing the "chief issue in the case" as being whether the district court had "abused its discretion" in dismissing a criminal indictment, and also describing the dismissal of an indictment as *"the most drastic remedy"* (emphasis in original), set out the following test:

> The extreme sanction of dismissal of an indictment is justified in order to achieve one or both of two objectives: first, to eliminate prejudice to a defendant in a criminal prosecution; second, to "help

---

**2.** The district judge issued an "Addendum and Memorandum" to the order dismissing the indictment the day after that order was issued, in which he explained that, at the government's request, he had interviewed, *in camera*, a witness who had not testified at the trial. This witness had known Brown at the times relevant to the prosecution, and the government apparently hoped that her testimony would dissuade the district court from dismissing the indictment. The court concluded, however, that the witness "enhance[d] rather than allay[ed] our concern about the possibility of a frame-up," and suggested that, if there was to be a re-trial, the government would be wise not to call the witness to the stand.

**3.** Under *United States v. Sanford*, 429 U.S. 14, 97 S.Ct. 20, 50 L.Ed.2d 17 (1976) (per curiam), and *Serfass v. United States*, 420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975), the order dismissing the indictment after the declaration of the mistrial is a pre-trial order, *i. e.*, an order preceding the second trial, and is fully appealable under 18 U.S.C. § 3731. *See generally* E. Cooper, *Government Appeals in Criminal Cases: The 1978 Decisions*, 81 F.R.D. 539 (1979).

translate the assurances of the United States Attorneys into consistent performances by their assistants."

592 F.2d at 646, 647. (footnotes omitted). The Court went on to explain each of these elements in the following fashion:

> Even when a *prosecutorial* arm of the government unlawfully obtains evidence, we normally limit the permissible sanction to suppression of the illegally obtained evidence. It is only in the rare case, where it is impossible to restore a criminal defendant to the position that he would have occupied vis-a-vis the prosecutor, that the indictment may be dismissed.
>
> .     .     .     .     .
>
> As for the deterrence objective of the district court's order here, proper regard for the public interest in the prosecution of crimes counsels restraint in dismissing an indictment for deterrence purposes unless the course of official misconduct is a demonstrated, long-standing one. We have approved this extreme sanction only when the pattern of misconduct is widespread or continuous.

592 F.2d at 648 (emphasis in original). *See also United States v. Ciambrone*, 601 F.2d 616, 623, 624–625 n.6 (2d Cir. 1979); *id.* at 627–629 (Friendly, *J.*, dissenting); *United States v. Schlesinger*, 598 F.2d 722, 726 (2d Cir. 1979); *United States v. Broward*, 594 F.2d 345, 350–51 (2d Cir. 1979), *cert. denied*, —— U.S. ——, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979); *United States v. Jacobs*, 531 F.2d 87 (2d Cir.), *vacated and remanded*, 429 U.S. 909, 97 S.Ct. 299, 50 L.Ed.2d 277 *aff'd on remand*, 547 F.2d 772 (2d Cir. 1976), *cert. dismissed*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978); *United States v. Bertolotti*, 529 F.2d 149, 159 (2d Cir. 1975); *United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972). Emphasizing the exceptional nature of this remedy, the Court cautioned in *United States v. Broward, supra* :

> [T]he sanction is so drastic that, especially where serious criminal conduct is involved, it must be reserved for the truly extreme cases.

594 F.2d at 351. In our judgment, the case before us is not a "truly extreme case."

As to the prejudice to the defendant resulting from what was quite obviously a faulty system for supervising the government's paid informant, it is our judgment that this prejudice is not of the type that should be cured by means of dismissal of the indictment. There is no claim here that the agents should not have arrested Brown, or that probable cause was lacking to support the arrest. Even if that were the case, the proper remedy would be suppression of the evidence rather than dismissal of the indictment. Neither is there any claim that the prosecutor's office deceived the grand jury during the process of securing an indictment, or that the grand jury had insufficient information to support its decision to hand down the indictment. Nor is there a claim that the United States Attorney's office abused its considerable prosecutorial discretion in deciding to seek an indictment and proceed to trial. The most that can be said in support of the dismissal of the indictment in this case is that the government's case against Brown was surprisingly weak and that this weakness was in large part a matter of its own doing. The nature of the case is such that its outcome hinges on credibility, not a rare occurrence in our judicial system. Thus, without in any way minimizing the concern over the government's use of an informant paid as Delli Santi was and the dangers inherent therein expressed in *United States v. Neal*, 536 F.2d 533 (2d Cir.), *cert. denied*, 429 U.S. 857, 97 S.Ct. 155, 50 L.Ed.2d 134 (1976); *United States v. Cuomo*, 479 F.2d 688 (2d Cir.), *cert. denied*, 414 U.S. 1002, 94 S.Ct. 357, 38 L.Ed.2d 238 (1973); and *United States v. Smalls*, 363 F.2d 417 (2d Cir. 1966), *cert. denied*, 385 U.S. 1027, 87 S.Ct. 755, 17 L.Ed.2d 675 (1967), we hold that the district court abused its discretion in deciding that the prejudice to the defendant resulting from the practices engaged in in this case warranted dismissal of the indictment. That the central issue in this case—whether Brown knew that the pipe bombs were really pipe bombs—is to be resolved by means of a "swearing contest" between Brown and

Delli Santi is not justification for the contest's being called off.

As to the deterrence objective inherent in the dismissal of an indictment, there has been no showing, and the district court did not imply, that the less than exemplary system for supervising this informant is representative of government conduct that is "widespread or continuous." Indeed, prior to the time that the district court announced its decision, the government forwarded a letter which included the following passage:

> We, of course, must agree that the better practice would have been for the agents involved in the investigation to give more attention to the proper supervision of the informant. In this regard, we share Your Honor's concerns. To insure that appropriate supervision is provided in the future and to prevent a reoccurrence of the conduct which has troubled Your Honor in this case, we have scheduled a conference with Michael J. LaPerch, Jr., Special Agent-in-Charge of the New York office of the Bureau of Alcohol, Tobacco and Firearms, during which we intend to advise Mr. LaPerch of the Court's concern with respect to the manner in which the investigation of this case was conducted.

In the absence of a showing that the government has been supervising informants in a manner that produces substantial danger of unreliability, and in view of the promise made by the government to examine and modify whatever procedures might have allowed the unsupervised roaming of the informant in this case, we cannot say that the deterrence objective of dismissing an indictment was warranted.

Accordingly, the judgment of the district court is reversed and the indictment is ordered reinstated.