**UNITED STATES of America,**

v.

**James Mitchell NEWMAN, Defendant.**

**No. 82 Cr. 166–CSH.**

United States District Court,
S. D. New York.

March 23, 1982.

John S. Martin, Jr., U. S. Atty., S.D.N.Y., New York City, for the U. S.; Lee S. Richards, Asst. U. S. Atty., New York City, of counsel.

Gordon, Hurwitz, Butowsky, Baker, Weitzen & Shalov, New York City, for defendant; Franklin B. Velie, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Defendant James Newman moves to dismiss this indictment charging him with securities and mail fraud, or in the alternative, to disqualify John S. Martin, Jr., the United States Attorney for this District, and his entire office from further involvement in the case. The motion is based upon alleged improprieties of Martin which violated the Code of Professional Responsibility promulgated by the American Bar Association ("ABA") and adopted by New York. 29 McKinney's Consol.Laws of N.Y. (1975) at pp. 351 et seq. By opinion and order dated February 25, 1982 I denied Newman any relief on the basis of the submissions then before me. 534 F.Supp. 1109. Newman has now submitted further affidavits and arguments on the point, which have triggered further responses from the Government. Accordingly the issue must again be addressed. While familiarity with my prior opinion is assumed, it may be useful to restate the underlying facts. Additional factual material is culled from the most recent submissions.

### I.

In early 1978, a grand jury for this District was conducting an inquiry into the possible illegal use of "insider" information in respect of corporate mergers and acquisitions, in violation of the securities, mail and wire fraud statutes. Newman, the present defendant, was a target of that inquiry. A time came in early 1978 when Newman and his wife, Pearl Seiden Newman, consulted Myron Rosner, Esq., an attorney with offices in Hackensack, New Jersey, with respect to the grand jury inquiry. Rosner had represented Norman Seiden, Mrs. Newman's father, in family and business matters. At this meeting Newman advised Rosner, in a general way, of the nature of the transactions underlying the investigation, and that he had become a target of it. Rosner advised Newman to retain Arthur Christy, Esq., a member of the bar of this Court experienced in criminal defense work, to represent him in the matter. Newman accepted Rosner's advice, and shortly thereafter, accompanied by Rosner, went to Christy's office for a lengthy debriefing interview of Newman by Christy.[1]

About two weeks later, Seiden told Rosner that he (Seiden) had received a request for information from the office of the United States Attorney. As he had for Newman, Rosner determined to obtain a lawyer for Seiden more familiar with matters of this nature, and, after conversing with other lawyers in New York, arranged for Martin to represent Seiden. At that time Martin was in private practice, as a partner in a firm which did a considerable amount of criminal defense work.[2]

Rosner describes his initial contacts with Martin as follows:

---

1. Rosner affidavit of February 26, 1981 at ¶¶ 1–4.

2. *Id.* at ¶¶ 5, 6.

"In the course of briefing Mr. Martin as to the matter for which we required his services, I disclosed the following: I told Mr. Martin that I had interviewed Norman Seiden and was satisfied that Mr. Seiden had nothing to fear from the criminal investigation. I told Mr. Martin that Mr. Newman was Mr. Seiden's son-in-law, was a target of the investigation and that, within the bounds of law, Mr. Seiden wanted to assist Mr. Newman's defense. Because of these circumstances, I considered my communication with Mr. Martin to be clothed in the attorney-client privilege. In employing Mr. Martin, I disclosed to him in a summary way my understanding of the facts, and answered the questions Mr. Martin put to me. While I do not recall now the details of the conversation, the only facts I had at that time I had obtained from Mr. Newman in privileged communications to me. I told Mr. Martin, in substance, based upon my understanding of the facts, that Mr. Newman may very well be in trouble in the investigation. I had, I believe, two telephone conversations and one face-to-face meeting with Mr. Martin, during which I gave Mr. Martin my understanding of Mr. Newman's problem, the facts I felt Mr. Martin needed, and answered questions Mr. Martin put to me. I believe I also told Mr. Martin that Mr. Newman had retained Arthur Christy to represent him, and he should feel free to call Mr. Christy." [3]

Returning at the end of his affidavit to his communications with Martin, Rosner states:

"I have a clear recollection that, perceiving Mr. Martin to be in effect another lawyer who would be representing the family's interests, I did disclose in a summary way what Mr. Newman had told me and my own conclusion from those facts that, while Mr. Seiden was not at risk in this investigation by reason of any of his conduct, Mr. Newman was." [4]

While the parties differ on certain underlying facts and the proper inferences to be drawn from them, it is common ground that Martin agreed to represent Seiden, and eventually accompanied Seiden to an interview at the office of Assistant United States Attorney Lawrence Pedowitz. The time records of Martin's former firm indicate that this meeting probably occurred on July 28, 1978.[5] Rosner accompanied Seiden and Martin. His account of the interview appears in his affidavit at ¶ 7:

"My recollection of the interview with the United States Attorney was that it was short and that a point of interest was a wedding list of the recently celebrated marriage of Mr. Newman and Pearl Seiden Newman. I recall that Mr. Seiden was asked the names of various persons and whether he knew those persons."

Seiden has submitted an affidavit giving his recollection "that I met with John S. Martin, Jr. only once. This was at the United States Attorney's office immediately before my interview with the government." [6] In an unsworn letter dated January 8, 1982 which Seiden sent to Martin (after Martin had been appointed United States Attorney and Newman had been indicted), Seiden stated that Martin had "obtain[ed] confidential and privileged information from me," and that, pursuant to Martin's counsel and advice, "I gave information and documents to the office of the United States Attorney."

Martin's account of these events appears in three documents. The first is his letter of January 15, 1982, written in response to Seiden's letter of January 8 just referred to. Martin swears to the accuracy of the account given in that letter in his affidavit of March 2, 1982, submitted in connection with these proceedings, to which a copy of the January 15 letter is attached. Martin has also furnished a supplemental affidavit dated March 4, 1982.

---

**3.** *Id.* at ¶ 6.

**4.** *Id.* at ¶ 8.

**5.** Martin affidavit of March 4, 1982 at ¶ 7.

**6.** Seiden affidavit of March 8, 1982 at ¶ 2.

In his letter of January 15, 1982 to Seiden, Martin recalled that after he and Seiden had met and discussed the matter, "a decision was made that you would provide to the Assistant United States Attorney then in charge of the case any information which he requested." The letter thereafter recites Martin's recollection that "as a result of this decision there was a meeting with Assistant United States Attorney Pedowitz in which you answered whatever questions he asked you." The Martin letter continues:

"I have very little recollection of the details of that meeting and no recollection of being aware of any facts obtained during my interview with you that were not communicated to Mr. Pedowitz."

The Martin affidavits submitted in response to the present motion recite that the time records of his former firm (the only documentation which can be located at that source) indicate that Martin was engaged on the Seiden matter on only four days, all in 1978. The dates and activities as recorded are as follows: June 29—conference and phone call with Arthur Christy, one hour; June 30—phone calls with Seiden and Pedowitz, one-half hour; July 25—trip to United States Attorney's office, one hour; July 28—trip to United States Attorney's office, one and one-half hours.[7] Martin suggests, and I accept as plausible, that the July 25 trip reflects a trip he made alone to Pedowitz's office to discuss the investigation with him prior to bringing Seiden in for an interview, and that the July 28 trip represents the interview itself.[8] This was the end of Martin's representation of Seiden, or his activities in his behalf. Martin states in his affidavit of March 4 at ¶ 6: "From the outset of that representation it was understood that he [Seiden] was in no sense a subject of the United States Attorney's office investigation."[9] It is apparent from the record that the investigators shared Rosner's evaluation, namely, that whereas Newman was vulnerable, Seiden

was not. Seiden was neither called as a witness before the grand jury nor indicted.

As noted in the quotations from his letter of January 15, 1982, *supra*, Martin's recollections of what actually took place are imprecise. That subject is dealt with further in Martin's affidavits of March 2 at ¶ 3, and March 4 at ¶ 10, which read as follows:

"I have no recollection of any facts, privileged or otherwise, provided to me by Myron Rosner, Esq. and I had no recollection of any such facts regarding the defendant Newman as of the time I assume the normal activities of the United States Attorney in this case a week or so before the return of the indictment. I certainly did not impart any such facts or assessment of Newman's culpability to any of my Assistants at any time, nor did I recall them at the time of, or rely on them in any decision made or action taken in the above-entitled case. Indeed, until receiving Mr. Rosner's affidavit I had no recollection of ever talking with him by phone or in person."

\*    \*    \*    \*    \*    \*

"While, as I stated in my original affidavit, I cannot recall any specific information disclosed to me by Mr. Rosner, I do know that I never considered myself to be in possession of any information which was based on privileged communications from Mr. Newman. I never spoke to Mr. Newman. My recollection is that the only information that I did receive from Mr. Rosner or Mr. Christy (then Newman's attorney) was very generalized information concerning the nature of the investigation and the basic allegations being made by the Government. I have no recollection of receiving and am relatively confident that I did not receive any factual information from Mr. Rosner or Mr. Christy that was incriminatory of Mr. Newman. I have no recollection of receiving and I do not believe I ever re-

---

**7.** Martin affidavit of March 4, 1982 at ¶ 7. It seems likely that there were also telephone conversations between Martin and Rosner, as described by Rosner's affidavit and not denied by Martin.

**8.** *Id.* at ¶ 8.

**9.** Affidavit of March 4, 1982 at ¶ 6.

ceived from Mr. Rosner or Mr. Christy any information that I would not have felt free to discuss with Mr. Pedowitz in the course of my conversations with him concerning the general nature of his investigation and the limited information that Mr. Seiden might have had that was relevant to that inquiry. Moreover, since it was contemplated that Mr. Seiden would tell everything he knew to the Government, and since according to my time records I could not have met with Mr. Rosner except when Mr. Seiden was present, it is inconceivable that Mr. Rosner ever disclosed any privileged information from Mr. Newman to me during any meeting I had with him, for Mr. Rosner would not have wanted Mr. Seiden to have been aware of any such information before being interviewed by the prosecutor."

Martin was appointed United States Attorney for this District on May 22, 1980. The grand jury investigation was still in progress; the original indictment, naming Newman and three other individuals (these others are fugitives) as defendants, was not filed until February 3, 1981. Martin states in his letter of January 15, 1982 that after he became United States Attorney he discussed the status of the case "briefly" with AUSA Lee Richards, then in charge of the investigation. Martin's letter continues: "In view of the fact that the matter was still in an investigatory stage, I decided not to participate in any matters relating to the case at that time." According to Martin's account, a week or so before the return of the first indictment, when the investigation relating to Newman "was basically concluded and the indictment was being prepared," [10] counsel for one of the co-defendants asked for an opportunity to meet with Martin to review the decision that had been made to prosecute his client. Martin again discussed the matter with Richards, who advised Martin that Seiden would not be either a defendant or a witness in the case. In those circumstances, Martin considered that he could resume his normal activities in the case; he and Richards met with the co-defendant's lawyer, but did not consider whether or not Newman should be included in the indictment, "because well before the first such meeting the decision to indict him had already been made." [11] Martin also signed the indictment when it was returned, and argued the Government's successful appeal to the Second Circuit from this Court's decision dismissing the indictment on unrelated grounds. 664 F.2d 12 (2d Cir. 1981).

Richards recalls only one conversation with Martin during the pre-indictment period, that being the discussion, a week or so before the return of the first indictment, with respect to the co-defendant.[12] Thus Richards apparently does not recall the initial status conference concerning the case which Martin describes in his letter of January 15, 1982. I do not regard the discrepancy as having any significance.

As noted, Martin has sworn that he has never imparted "any ... facts or assessment of Newman's culpability to any of my Assistants at any time." Richards, in charge of the case at all its stages, states in his affidavit of March 2, 1982:

"At no time in the pre-indictment investigation leading up to the first indictment against Newman or thereafter did John S. Martin, Jr., United States Attorney for the Southern District of New York, ever impart to me any facts concerning James Newman or opinion about his guilt or innocence."

## II.

Newman argues that, in the foregoing circumstances, the indictment must be dismissed; or, if not, the entire United States Attorney's office for this District must be disqualified; or, at the very least, Martin must be personally disqualified from further participation in the case.

---

10. Letter at p. 2.

11. Martin affidavit of March 2, 1982 at ¶ 4.

12. Richards affidavit of March 2, 1982 at ¶ 2.

The Government, resisting all these alternatives, stresses that Martin never passed on to the prosecutors in charge of the case any information he may have acquired about Newman. Thus there is no demonstrable prejudice to Newman; and in the absence of such prejudice, the Government argues, the motion fails under the authority of *United States v. Morrison*, 449 U.S. 361, 365–6, 101 S.Ct. 665, 668–69, 66 L.Ed.2d 564 (1981), *United States v. Brown*, 602 F.2d 1073 (2d Cir. 1979), and *United States v. Fields*, 592 F.2d 638 (2d Cir. 1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979).

I agree that Newman has not, and cannot, demonstrate actual prejudice to him arising out of Martin's prior representation of Seiden. But Newman presses for relief on the alternative basis of a perceived appearance of impropriety. The Government contended on oral argument that under the rule of *Fields* and *Brown, supra*, "the appearance of impropriety is irrelevant," a startlingly broad assertion from which the Government seemingly retreats in its post-argument brief.[13] The position originally staked out by the Government was really not defensible; no authority with which I am familiar exempts Government prosecutors from the application of Canon 9 of the Code of Professional Responsibility: "a lawyer should avoid even the appearance of professional impropriety." The question must therefore be further considered.

Newman relies upon both civil and criminal precedent in this important and sensitive area of professional ethics. On the civil side, he places primary reliance upon *Emle Industries Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir. 1973). *Emle* was a civil action for declaratory judgments that patents held by the defendant were invalid and unenforceable. The Second Circuit held that where plaintiffs' counsel had previously represented the part owner of the corporate defendant in patent litigation involving a claim that defendant's part owner controlled defendant and used that control for an illegal purpose, and the identical issue was involved in the declaratory judgment action, plaintiffs' attorney would be disqualified from asserting the substantially related claim against the defendant's part owner in the declaratory judgment action. Regarding the attorney in question as one who in effect "has crossed sides," 478 F.2d at 575, the court disqualified him in conformity with Canon 4, which provides: "A lawyer should preserve the confidences and secrets of a client." Newman relies upon broad language employed by Judge Kaufman, who wrote the *Emle* opinion.[14]

To the extent that civil cases furnish a useful analogy to a criminal defendant's effort to disqualify the Government's prosecutors, it is worthwhile to examine more recent Second Circuit authority.

In *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981), the Second Circuit stated generally:

"Recognizing the serious impact of attorney disqualification on the client's right to select counsel of his choice, we have indicated that such relief should ordinarily be granted *only when a violation of the Canons of the Code of Professional Responsibility poses a significant risk of trial taint. Armstrong v. McAlpin*, 625 F.2d 433, 444–46 (2d Cir. 1980) (en banc), vacated on other grounds and remanded, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981); *Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979). That risk is encountered when an attorney represents one client in a suit against another client, in violation of Canon 5, e.g., *Cinema 5, Ltd. v. Cinerama, Inc.*, 528

**13.** "Should this Court conclude, contrary to what we believe are the facts, that there exists the appearance of impropriety in this case, Mr. Martin will of course withdraw from any further involvement in it." Government brief at 25.

**14.** The opinion reads at 478 F.2d 571:

"Thus, where 'it can reasonably be said that in the course of the former representation the attorney *might* have acquired information related to the subject matter of his subsequent representation,' *T. C. Theatre Corp., infra*, at 269, (emphasis supplied), it is the court's duty to order the attorney disqualified."

F.2d 1384 (2d Cir. 1976), or might benefit a client in a lawsuit by using confidential information about an adverse party obtained through prior representation of that party, in violation of Canon 4, e.g., *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562 (2d Cir. 1973)." (emphasis added).

It is, of course, the latter of these two risks that Newman urges; to the extent that ethical problems arise out of the facts of this case, they implicate Canon 4.

*Glueck* holds that in the absence of "a significant risk of trial taint," the appearance of impropriety ordinarily does not constitute a sufficient ground for the disqualification of counsel. That ruling was presaged by the two earlier Second Circuit cases cited in *Glueck* for the proposition. In *Board of Education v. Nyquist,* 590 F.2d 1241, 1247 (2d Cir. 1979), the Second Circuit said:

"We believe that when there is no claim that the trial will be tainted, appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases. This is particularly true where, as in this case, the appearance of impropriety is not very clear."

*Armstrong v. McAlpin,* 625 F.2d 433 (2d Cir. 1980), an *en banc* decision, states:

"... absent a threat of taint to the trial, we continue to believe that possible ethical conflicts surfacing during a litigation are generally better addressed by the 'comprehensive disciplinary machinery' of the state and federal bar, see *Nyquist,* supra, 590 F.2d at 1246, or possibly by legislation. While there may be unusual situations where the 'appearance of impropriety' alone is sufficient to warrant disqualification, we are satisfied that this is not such a case." (footnotes omitted).

The most recent civil case in which the Second Circuit considered disqualification under Canons 4 and 9 is *Cheng v. GAF Corp.,* 631 F.2d 1052 (1980). In 1977 the plaintiff Cheng instituted an employment discrimination action against the defendant GAF. Cheng was represented by Legal Services for the Elderly Poor ("LSEP"). From the start GAF was represented by a law firm referred to in the opinion as the "Epstein firm." In October, 1979, while the Cheng case was still in the discovery phase, the Epstein firm hired one Philip Gassel as an associate in its health law department. From 1974 until his association with the Epstein firm, Gassel had been employed as a senior attorney at LSEP. After learning of Gassel's new association, Cheng filed a motion to disqualify the Epstein firm from further representation of GAF. Cheng conceded that while Gassel was employed at LSEP he did not represent Cheng in the litigation; however, Cheng claimed that Gassel did participate in discussions with other members of the staff about the GAF case. In aid of that claim, Cheng submitted affidavits alleging that Gassel was personally introduced to Cheng; he "was present at and participated in several discussions with other LSEP attorneys and law students regarding the conduct, strategy, and facts of Mr. Cheng's case;" he discussed Cheng's communications with the representing attorney. These allegations were not challenged or refuted in any way; they led the Second Circuit to "find that the affidavits demonstrate that Gassel did have knowledge of Cheng's confidences and secrets..." 631 F.2d at 1057 n.5.

The district court had "assumed for the purposes of the motion that Gassel had been privy to some confidential disclosures," 631 F.2d at 1057, but denied the motion to disqualify the Epstein firm anyway. Therefore, "the district court refrained from deciding whether Gassel had rebutted the presumption that he had obtained impermissible knowledge of Cheng's confidences and secrets." *Ibid.* On that record, the Second Circuit reversed the district court and disqualified the Epstein firm. Reviewing prior authority, the Second Circuit stated generally in *Cheng* at 1056:

"Determination of a violation of Canon 4 sufficient to disqualify an attorney traditionally has been based on a finding of concurrent or successive representation in the same or substantially related matters."

The Court summarized the factual situation in *Cheng* as follows:

"In the instant case, there is no dispute that the matters involved in Gassel's former association with Cheng are substantially related to his present association; the suit and the parties have remained the same throughout the proceedings. The only changing factor has been Gassel, who has moved from the plaintiff's firm to the defendant's firm, thus becoming subject to a disqualification challenge." *Ibid.* (footnote omitted).

The Epstein firm was subject to disqualification because, in the Second Circuit's words, Gassel's "disqualification under Canon 4 would implicate the sweeping prohibition of representation by a tainted attorney's co-workers contained in Canon 5." *Id.* at 1056. The opinion in *Cheng* continues:

"Disciplinary Rule 5–105(D) provides: 'If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment.'" *Ibid.*

In point of fact, the purported quotation of Disciplinary Rule 5–105(D) is not accurate; the Rule actually provides:

"If a lawyer is required to decline employment or to withdraw from employment under DR 5–105, no partner or associate of his or his firm may accept or continue such employment."

That is to say, the Second Circuit's more general phrase "under a Disciplinary Rule" does not appear in the Rule itself; the actual phrase is "under DR 5–105." That precise wording might support the argument that the disqualification of a tainted attorney's co-workers should be limited to Canon 5 cases, whereas this is a Canon 4 case, and no such provision appears in the Rules following Canon 4. But the *Cheng* case constitutes a clear holding that disqualification of an attorney in a civil case under Canon 4 leads to the disqualification of his entire firm by virtue of Rule 5–105(D); and this holding would appear consistent with the broad and remedial purposes of the Code. The Second Circuit disqualified the Epstein firm despite the latter's efforts to erect a "Chinese Wall" around their newly acquired associate, Gassel; the Court observed at 1058:

"Although Gassel may not be personally involved in the Cheng defense, he is a member of a relatively small firm. The matter involved in his prior exposure to Cheng while at LSEP is still being actively pursued by attorneys for GAF at the Epstein firm. Despite the Epstein firm's protestations, it is unclear to us how disclosures, admittedly inadvertent, can be prevented throughout the course of this representation. Unlike many disqualification motions that appear before this Court, here there exists a continuing danger that Gassel may unintentionally transmit information he gained through his prior association with Cheng during his day-to-day contact with defense counsel." (footnotes omitted).

Finally, the Second Circuit in *Cheng* also rested its disqualification decision upon Canon 9 and its warning that "a lawyer should avoid even the appearance of professional impropriety." Although the *Cheng* Court noted the prior holdings in *Armstrong* and *Nyquist* that "where there is no danger that the underlying trial will be tainted, appearances of impropriety alone are insufficient to justify disqualification," *id.* at 1058, the Court observed:

"It is possible that, despite attempts by the Epstein firm to screen Gassel, the underlying trial could be tainted through GAF's inadvertent use of the unfair advantage it has over Cheng. This case presents, therefore, both the danger of tainting the underlying trial and the unacceptable appearance of impropriety condemned in Canon 9." *Id.* at 1059.

I turn now to the criminal cases. Neither party cites, nor has my own research disclosed, a Second Circuit decision considering a criminal defendant's motion to disqualify the United States Attorney or his staff, or to dismiss an indictment, because of perceived breaches of the Canons of Ethics. On the criminal side, Newman relies upon

*United States v. Catalanotto*, 468 F.Supp. 503 (D.Ariz.1978), and *People v. Shinkle*, 51 N.Y.2d 417, 434 N.Y.S.2d 918, 415 N.E.2d 909 (1980). The Government calls my attention to *United States v. Caggiano*, 660 F.2d 184 (6th Cir. 1981).

In *Catalanotto*, a defendant named Rae moved to disqualify the office of the United States Attorney for the District of Arizona, and to quash a second superseding indictment against him. The motion was based on Rae's prior relationship with an Assistant United States Attorney named Cooper. Cooper had been a state prosecutor, but in January, 1978, he entered private law practice. Rae, in a sworn affidavit in support of his motion, averred that he retained Cooper in connection with various state and federal investigations that were then being conducted, further alleging that he spent many hours detailing to Cooper his relationship with several individuals, including one Battaglia, co-defendant in the federal indictment eventually lodged against Rae. Rae also averred that he had discussed an automobile with Cooper, that same automobile being the one that subsequently figured in the indictment. (The precise nature of the charges against Rae do not appear in the opinion.)

In March, 1978, Cooper ceased representing Rae, and spoke with the First Assistant United States Attorney for the Tucson office of the District of Arizona, with regard to possible employment. Cooper was offered a job, and commenced work with the office of United States Attorney in May, 1978. Cooper had not been paid by Rae for his prior representation, and, through an assignee, had commenced suit against Rae in the state court to recover legal fees.

In August, 1978, the United States Attorney's office in Tucson presented an indictment to the grand jury charging Rae, among others. The head of the Tucson office issued an order to its employees, indicating that the case involving Rae and his co-defendants should not be discussed in the presence of Cooper, nor was Cooper to be given access to any of the information in the file. Opposing the motion to disqualify,

Cooper and the head of the Tucson office submitted affidavits averring that they had had no relevant communication with regard to the case. On one occasion, Cooper was in the First Assistant's office when the latter received a telephone call regarding the case; Cooper left the room. Cooper was assigned to the criminal section of the Tucson office, in which approximately ten attorneys were employed; his office adjoined one of the two attorneys primarily responsible for the prosecution of the case against Rae.

After reviewing Ninth Circuit and Arizona authorities, the district court held that the office of the United States Attorney in Tucson "must be disqualified if a substantial relationship can be shown between the subject matter of the private representation and the subject matter of the prosecution." 468 F.Supp. at 506. The court continued:

"Looking at the totality of the circumstances surrounding the representation of Mr. Rae by Mr. Cooper, it appears that there is a strong possibility that the representation and the subsequent prosecution were substantially related. Even if there is a question as to what, if anything, concerning this case was actually revealed, there is certainly the appearance that the opportunity to reveal matters related to this case existed. Canon 9 admonishes attorneys that even the *appearance* of professional impropriety should be avoided. In this case the appearance of impropriety can certainly be drawn from the surrounding circumstances." *Id.* at 507 (emphasis in original).

The district court in *Catalanotto* cited as a second reason for disqualification the private lawsuit Cooper had commenced against Rae to collect his legal fees, finding an "appearance of impropriety" in that "it can well appear to Mr. Rae and to the public generally that his prosecution could be retaliatory or coercive in nature." *Ibid.*

As for the remedy, the district court disqualified the Tucson office of the United States Attorney, but denied the motion to disqualify the entire district office, expressing the view that the prosecution could

properly be conducted by the larger Phoenix office of the United States Attorney, under the rationale of *United States v. Weiner*, 578 F.2d 757 (9th Cir. 1978) (in securities prosecution, defendant's motion to disqualify office of United States Attorney denied where, although an attorney previously employed by a law firm representing the defendants had left the firm and gone to work for the SEC, and defendants alleged close cooperation between the SEC and the United States Attorney resulting in prosecution, the Ninth Circuit found that the size and complexity of the governmental agencies involved made any imputation of knowledge impossible).

In *People v. Shinkle*, the defendant was prosecuted for rape, larceny, and assault. An attorney named Lesser, of the Legal Aid Society of Sullivan County, was assigned to represent defendant. Another attorney, Edward Leopold, then the executive director of the Legal Aid Society, "became actively involved as adviser to Lesser during the early stages of the criminal proceeding. In this capacity Leopold interviewed the defendant extensively, was intimately familiar with the contents of his file, and assisted in the formulation of defense strategy." 51 N.Y.2d at 419, 434 N.Y.S.2d at 919, 415 N.E.2d at 910. Before the case came to trial, Leopold resigned as executive director of the Legal Aid Society, and was appointed Chief Assistant District Attorney for Sullivan County, continuing in that capacity during the trial of the action, in which defendant was convicted.

In these circumstances, the New York Court of Appeals held in a 5–2 decision that the conviction must be vacated, "and the case remitted to County Court, Sullivan County, for further proceedings on the indictment," presumably under the direction of a special prosecutor. *Id.* at 421 and 434 N.Y.S.2d at 920, 415 N.E.2d at 911; see Judge Jasen's dissent at 424–25 and 434 N.Y.S.2d at 922, 415 N.E.2d at 912–13. Although upon his appointment to the District Attorney's office, Leopold and the District Attorney had attempted to erect "Chinese Walls" between Leopold and any cases in which defendants had been represented by the Legal Aid Society during his tenure of office, the court was not satisfied:

> "The fact that the attorney who had initially represented defendant and participated actively in the preparation of his defense was chief assistant in the office of the prosecutor in the months preceding and during defendant's trial inescapably gave both defendant and the public the unmistakable appearance of impropriety and created the continuing opportunity for abuse of confidences entrusted to the attorney during the months of his active representation of defendant. It is no answer that defendant offers no evidentiary proof of actual prejudice. In the circumstances such proof would most likely be out of defendant's reach. Nor does it serve to protect the interests of defendant that procedures were devised and scrupulously followed to insulate Leopold from the prosecution of this case." 51 N.Y.2d at 420–21, 434 N.Y.S.2d at 920, 415 N.E.2d at 910.

In *United States v. Caggiano, supra,* Caggiano was one of several defendants in a prosecution for mail and wire fraud. The first trial had resulted in a mistrial when the jury could not agree. Prior to commencement of the second trial, Caggiano and his co-defendants, Baszner and Winfield, moved to disqualify the entire United States Attorney's office in Memphis, Tennessee because of the prior representation of Caggiano by an Assistant United States Attorney named Canale. While in private practice, Canale, along with another lawyer named Kizer, had represented Caggiano during the first trial and during the preliminary stages of his defense to the second indictment. At that point in the litigation, Canale left private practice to become an Assistant United States Attorney in the office prosecuting Caggiano; Kizer, a former partner of Canale's, continued with the defense. In these circumstances, Caggiano moved to disqualify the entire United States Attorney's office. Co-defendants Baszner and Winfield joined in that motion, basing their applications upon affidavits executed by their attorneys to the effect that

they had met with Canale several times during the initial term, and that, as a result of such meetings, Canale had become privy to confidential information and strategy relating to the co-defendants' defense.

The Government, opposing the motion, offered affidavits to the effect that Canale would have nothing to do with the prosecution, and that he had imparted no confidential information to any of the prosecutors in charge of the case. The district court, while determining that no defendant had made any "showing of any actual prejudice to [him] by any revelation, direct or indirect, intended or unintentional, of information by Canale bearing upon their defenses, their strategies or their confidences," 660 F.2d at 188, nevertheless expressed concern of the "appearance of impropriety," and in order "to avoid a lengthy trial that could be determined on appeal to be a tainted one," granted Caggiano's motion with "considerable reluctance." *Ibid.* The district court denied Baszner's and Winfield's motions, "since neither had enjoyed a genuine attorney-client relationship with Canale and since neither had shown any prejudice." *Id.* at 189.

The Sixth Circuit held that it had no jurisdiction over the appeal of co-defendants Baszner and Winfield, "as the order denying their motion to disqualify from which they appeal is not a final appealable order as to them under 28 U.S.C. § 1291." *Id.* at 191. On the Government's appeal from the order disqualifying the entire office, the Sixth Circuit concluded that the order was appealable, and reversed on the

merits. In doing so, the court construed DR 5–105(D) to be "inapplicable to other government lawyers associated with a particular government lawyer who is himself disqualified by reason of DR 4–101, DR 5–105, DR 9–101(B), or similar disciplinary rules." *Id.* at 191. The Sixth Circuit relied upon a 1976 opinion of the ABA Committee on Professional Ethics to that effect, quoted at 190–91,[15] and upon a dictum of District Judge Kaufman (as he then was) in *United States v. Standard Oil Company*, 136 F.Supp. 345, 363 n.34 (S.D.N.Y.1955).[16]

While apparently the Second Circuit has not yet had occasion to consider a criminal defendant's motion to disqualify a United States Attorney because of the latter's prior private representations, a Government effort to disqualify defense counsel was presented in *United States v. Cunningham*, 672 F.2d 1064 (2d Cir. 1982). Cunningham, and his co-defendant Sweeney, are defendants in a prosecution for income tax evasion and obstruction of justice. Cunningham's designated trial attorney is Michael Tigar. The Government intends to call as a Government witness one Spain, an associate of Cunningham's, who had previously been indicted for perjury before the same grand jury investigating Cunningham; Spain's trial ended in a mistrial when the jury was unable to agree on a verdict, and he then agreed to plead guilty to a lesser offense and to testify against Cunningham. Tigar had represented Spain in the early stages of the latter's prosecution for perjury. In these circumstances, the Government moved to disqualify Tigar as Cunningham's

**15.** The ABA is presently considering, but has not acted upon, a revised draft of Model Rules of Professional Conduct which would, for the purpose of imputed disqualification, define "law firm" so as to include "the legal department of a government agency." Comment to proposed Rule 1.10.

**16.** Explaining why a government department would not be disqualified where a private law firm would, Judge Kaufman wrote:

"The answer which has been reached is that the hands of the government cannot be tied because of the former associations of one of its officials; therefore, that top person disqualifies himself from handling that particu-

lar matter, and the conflict of interest question is considered resolved. Similarly, the particular lower ranking attorney disqualifies himself and another attorney handles the matter. No such opportunity is given to one partner in a law firm to disqualify himself and qualify the firm. The only explanation for the difference in result is that the practical exigencies are more compelling in the former situation than the latter. This is another illustration of the fact that ethical problems cannot be viewed in a vacuum; practical, everyday facts of life must be considered."

attorney, on the ground that his prior representation would prevent Tigar from vigorously cross-examining Spain in Cunningham's behalf. The district court disqualified Tigar as Cunningham's trial counsel. The Second Circuit reversed.

As does Newman in the case at bar, the Government in *Cunningham* relied primarily upon *Emle Industries, Inc., supra.* However, Judge Kearse's opinion for the Second Circuit in *Cunningham* points out that "[t]he circumstances in *Emle* . . . bear little resemblance to those of the present case," adding that: "The principal *Emle* factors, i.e., an attorney switching sides and a challenge mounted by the former client, are not present with respect to Cunningham." At 1071. For the same reason, the Second Circuit in Cunningham distinguished *United States v. Ostrer*, 597 F.2d 337 (2d Cir. 1979), a criminal case in which the defendant's attorney had formerly been a Government prosecutor, who had personally handled the prosecutions of two persons who were to be Government witnesses at Ostrer's trial. The Second Circuit disqualified defense counsel in those circumstances, accepting the Government's contention that the attorney had, "as a government lawyer, obtained non-public information that he could use in defense of Ostrer." Judge Kearse wrote in Cunningham: "Our decision in *Ostrer* went no further than holding that the former client may secure the attorney's disqualification," also citing *United States v. Kaufman*, 429 F.2d 240, 247 (2d Cir.), *cert. denied*, 400 U.S. 925, 91 S.Ct. 185, 27 L.Ed.2d 184 (1970), which upheld the disqualification of defendant's attorney on motion of a co-defendant who was a prior client of the attorney. *Id.* at 1072. In *Cunningham*, the Second Circuit observes:

"No case has been called to our attention, and we are aware of none, in which an attorney has been disqualified on grounds of conflicting prior representation solely at the behest of a person other than the former client *or its privy." Id.* at 1072 (emphasis added).

17. See, *e.g., United States v. McPartlin*, 595 F.2d 1321, 1336 (7th Cir. 1979) and cases there cited.

The Court did not find it necessary, in the circumstances of *Cunningham*, to define the emphasized phrase.

In the light of these authorities, I consider the case at bar.

II.

The Government first argues that since Canon 4 requires a lawyer to preserve "the confidences and secrets *of a client,*" no ethical problems arise, since Martin represented Seiden, not Newman. Newman responds that he and Seiden should be regarded as participants in a "joint defense," within the context of those cases extending the attorney-client privilege to revelations by a defendant to counsel representing a co-defendant.[17] This proposition is elaborately briefed. The Government says that the "joint defense" concept has no application because Seiden has never been a suspect or a target, let alone a defendant. I need not pursue that question to its ultimate conclusion, because the issue does not turn entirely upon the technicalities of the attorney-client relationship. In *Glueck, supra,* the issue was whether a law firm that represented an incorporated trade association could represent an individual client in a suit against a corporation, one division of which was a member of the association. Judge Newman wrote for the Second Circuit at 653 F.2d 748: ". . . the issue is not whether Phillips Nizer's relationship to Logan is in all respects that of attorney and client, but whether there exist sufficient aspects of an attorney-client relationship 'for purposes of triggering inquiry into the potential conflict involved in Phillips Nizer's role as plaintiff's counsel in this action.'" (quoting the district court; footnotes omitted). There is also New York State authority for the proposition that "[t]he disqualification of an attorney by reason of conflict of interest will not be denied solely because there is no actual attorney-client relationship between the parties." *Nichols v. The Village Voice,*

*Inc.*, 99 Misc.2d 822, 417 N.Y.S.2d 415, 418 (N.Y.Cty.1979). The state court in *Nichols* quoted *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978) for the proposition that a "fiduciary obligation or an implied professional relation" may exist in the absence of a formal attorney-client relationship. The *Nichols* Court continued:

> "It is clear that where an attorney receives confidential information from a person who, under circumstances, has a right to believe that the attorney, as an attorney, will respect such confidences, the law will enforce the obligation of confidence irrespective of the absence of a formal attorney-client relationship."

(However, compare *United States v. Caggiano, supra*, in which the district court denied co-defendants' motions to disqualify the United States Attorney's office, on the ground that "neither had enjoyed a genuine attorney-client relationship" with the Assistant who had previously acted in a private capacity for the principal defendant, notwithstanding averments of counsel for the co-defendants that the attorney in question had participated in strategy discussions involving all three defendants. 660 F.2d at 189.)

Thus in the present case it is necessary to inquire whether, as between Martin and Newman, there exist "sufficient aspects of an attorney-client relationship" to trigger ethical concerns. That was not an inquiry necessary to conduct in *Emle, Catalanotto, Shinkle*, or *Cheng*, upon which Newman relies. In those cases, there had been a direct attorney-client relationship between the party seeking disqualification and the lawyer who had "crossed over" to the other side. That generalization may be applied to *Cheng*, although attorney Gassel did not directly represent Cheng during his employment at LSEP, the Second Circuit having found that as the result of Gassel's participation in discussions with other LSEP attorneys, Gassel obtained knowledge of Cheng's "confidences and secrets."

The decisive question, in my view, is whether as the result of the relationships and conversations described *supra*, Martin came into possession of Newman's "confidences and secrets" relating to the charges against him. Canon 4 speaks in terms of the preservation of "confidences and secrets," and it is the concern about revelation of such intimate knowledge that runs like a *leitmotiv* through the decided cases.

In *Cheng*, the Second Circuit cited with approval *T. C. Theatre Corp. v. Warner Bros. Pictures*, 113 F.Supp. 265, 268 (S.D.N.Y.1953), which held that in order to obtain disqualification, the former client "need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client," the district court in *Warner Bros.* further assuming "that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation." 631 F.2d at 1056. That was also an assumption which could be indulged in in *Catalanotto, supra*, and *Caggiano, supra*, where the Assistant United States Attorneys in question had, while in private practice, represented the defendants directly in respect of the matters subsequently charged in the indictment. Those are also the facts in *Shinkle*. They are not the facts in the case at bar, since it is common ground that Martin was never retained by, met with, or talked to Newman. The question that arises, therefore, is whether knowledge of Newman's "confidences and secrets" may be imputed to Martin, as the result of his contacts with Seiden, Rosner and Christy.

■ While it is arguable that these contacts support an inference that Martin became privy to Newman's "confidences and secrets," that inference is rebuttable. *Silver Chrysler Plymouth Inc. v. Chrysler Motors Corp.*, 518 F.2d 751 (2d Cir. 1975), cited for that proposition in *Cheng* at 1056–57. In the case at bar, I find that the affidavits rebut the inference. Seiden's letter to Martin of January 8, 1982 says only that he

informed Martin that Newman was a target of the investigation, and that Seiden wished to assist in the defense of his son-in-law. Rosner's affidavit recites that he disclosed to Martin "in a summary way" Rosner's understanding of the facts; he told Martin "in substance, based upon my understanding of the facts, that Mr. Newman may very well be in trouble in the investigation." In other words, "I did disclose [to Martin] in a summary way what Mr. Newman had told me and my own conclusions from those facts that, while Mr. Seiden was not at risk in this investigation by reason of any of his conduct, Mr. Newman was." Rosner affidavit at ¶ 8.

Martin, it will be recalled, has no recollection of receiving, and is "relatively confident" that he did not receive "any factual information from Mr. Rosner or Mr. Christy that was incriminatory of Mr. Newman."

It is quite clear that Newman received from Rosner and Seiden, and possibly also from Christy, the impression that whereas Seiden had nothing to worry about, Newman did. That may be regarded as an "incriminatory" impression; but if that is all Martin received, it falls far short of conveying or imputing to him those detailed, precise, and factual "confidences and secrets" with which Canon 4 is concerned. Martin denies that he received such "confidences and secrets" in respect of Newman; there is nothing of substance in Seiden's and Rosner's declarations to contradict him.

Nor does Newman submit any affidavit from his former attorney, Christy. Christy represented Newman at the arraignment, and at the initial scheduling conference before me. Thus Christy was aware, by virtue of Martin's signing the indictment as United States Attorney, that Martin was participating in the case, at least to that extent. The circumstances surrounding Christy's replacement by Newman's present counsel are not revealed by the record; but one would expect that if, during his conversation with Martin while Christy represented Newman and Martin represented Seiden, Christy had revealed to Martin that sort of confidential or secret information concerning Newman which implicates Canon 4, an affidavit to that effect from Christy would have been submitted.

In short, I find on the record that Martin has successfully rebutted any inference of conveyed or imputed knowledge with respect to Newman's confidences, secrets or defense strategy. Martin's relatively brief representation of Seiden does not give rise to a conclusive presumption that Martin acquired or became privy to Newman's confidences and secrets; to the extent that any such inference arises, it is rebuttable, and Martin has rebutted it. No violation of Canon 4 appears from this record.

█ Nor does Newman prevail by reliance upon Canon 9 and its prohibition of "the appearance of professional impropriety." The affidavits of Martin and Richards establish that Martin imparted nothing of a confidential nature about Newman to his assistants. In consequence, there is no risk of taint at the trial. The Second Circuit, while leaving the question open, has yet to disqualify counsel on the basis of an appearance of impropriety alone. *Cheng, supra*, is not such a case; although the Second Circuit in disqualifying counsel relied upon Canon 9, 631 F.2d 1058, the facts of the case presented "*both* the danger of tainting the underlying trial and the unacceptable appearance of impropriety condemned in Canon 9." *Id.* at 1059. In the case at bar, there is no risk of taint; and even if I perceived an appearance of impropriety, I would not require disqualification of Martin from further involvement in the case on the basis of that appearance alone.

In point of fact, I perceive no appearance of impropriety on the facts of this case; nor do I believe that the citizenry with whose perceptions the Canons are rightly concerned would do so. Martin's representation of Seiden was brief and limited; during its course he learned nothing of a confidential nature from Newman; after becoming United States Attorney, Martin stayed out of the case entirely until he was satisfied that Seiden would be neither a defendant nor a witness; when that became apparent, Martin resumed his normal duties.

I detect no appearance of impropriety in that, and do not believe that a reasonable layman would.[18] To be sure, Newman and his present counsel proclaim a "gross appearance of impropriety," but they are hardly objective about the question.

I therefore decline to disqualify Martin from further involvement in this case.

■■■ It follows, of course, that the entire United States Attorney's office for this District will not be disqualified. Martin not being subject to disqualification under Canon 4, DR 5-105(D) has no office to perform. But had I reached a different conclusion in respect of Martin individually, I would have denied on the ground of laches Newman's effort to disqualify the entire office. Under appropriate circumstances, laches will bar an effort to disqualify the adversary's counsel. *Emle, supra,* at 574; *Nichols, supra,* 417 N.Y.S.2d at 419. In the case at bar, Martin's representation of Seiden terminated in 1978. Martin was appointed United States Attorney in May, 1980. Newman, although knowing that he was a target of an ongoing grand jury investigation, made no suggestion that Martin should be disqualified (although, as noted *supra,* Martin disqualified himself until he knew that Seiden would be neither a defendant nor a witness). The indictment was returned, naming Newman as a defendant, on February 3, 1981. Martin signed the indictment as United States Attorney. Newman, through his then attorney Christy, made no protest.[19] Martin argued the appeal from this Court's dismissal of the original indictment (on unrelated grounds), and his name was on the brief. The case was argued in the Second Circuit on July 17, 1981; the brief revealing Martin's participation was in defense counsel's hands prior to that date. Newman and his present counsel made no objection with respect to Martin's involvement. Indeed, Newman's counsel did not raise the question at all until his letter to the Court of February 2, 1982, enclosing the Seiden/Martin exchange of correspondence during the preceding month. As of that time, the Court had under advisement Newman's application for a further continuance of the trial pending a petition to the United States Supreme Court for certiorari; coincidentally the Court denied that application in an order also dated February 2, setting the case down for trial in March.

As the courts have recognized, protestations of ethical outrage are often intended to disguise the tactical motives prompting an effort to disqualify opposing counsel. See, *e.g., Nyquist, supra,* at 1246: the court's reluctance to disqualify counsel "probably derives from the fact that disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons." I regard the present motion as similarly inspired. The prejudice to the Government of disqualifying the entire United States Attorney's office is apparent, since trial is now scheduled for April 19, 1982, and entirely new trial counsel (either from another district or the Department of Justice in Washington) would require a considerable amount of time to prepare this complicated case for trial, thereby exposing the Government to further delay.

■■■ Lastly, even if I perceived improprieties here, I would not dismiss the indictment. *Morrison, supra,* teaches at 365 that "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." *Fields, supra,* at *Brown, supra,* are to like effect. While the district judge in *Catalanotto, supra,* felt impelled to dismiss the

---

**18.** Entirely different questions would arise if Seiden had been indicted, or Christy, not Martin, had become United States Attorney. The ethical considerations that would be implicated in such circumstances may be left for another day. In a city where successful criminal defense counsel frequently accept service in the office of the United States Attorney, the issue is a significant one.

**19.** That silence supports the inference that Christy did not regard himself as having revealed Newman's confidences and secrets to Martin when Martin was representing Seiden.

**1128**

indictment by analogizing disqualified counsel to an unauthorized presence before the grand jury, I find the analogy strained and the result contrary to the weight of the authorities. Thus, even if I detected impropriety or its appearance in this case, I would not dismiss the indictment.

Defendant's motion is denied in all respects.

It is So Ordered.